## CADBURY *v.* NOLEN.

Vendor of chattels released from warranty of title is a competent witness for his vendee, to sustain his own title where it is sought to be avoided as fraudulent by a creditor of his vendor, who purchased under an execution.

Where the question was, whether an alleged sale of chattels was fraudulent as to creditors for want of a notorious change of possession; and because it was merely colourable to elude creditors, the court should instruct the jury as to the nature and effect of legal fraud, and it is not sufficient to leave the case to them to decide generally whether the sale was fraudulent or not.

To tell the jury that the evidence of a particular witness did not disclose a fraud, where such evidence, if believed, showed facts which would have avoided a sale by reason of fraud, legal or actual, is ground for reversal.

Sale of chattels is void, if intended by both parties to elude executions, or if there be no visible and notorious change of possession, so far as is compatible with the nature of the property.

A. made a sale of chattels, and transferred the securities to B., his judgment creditor. B. may avoid the sale by an execution, if it was fraudulent as to creditors; and *semble*, whether there was an actual fraudulent intent, or but constructive fraud by reason of non-delivery of possession.

In error from the Common Pleas of Clearfield.

*May* 28. This was an action of replevin for four rafts of timber, of which defendant claimed title as a purchaser, under executions against Ralston, one of which issued at the suit of the defendant. For the purposes of the decision here it is necessary to set out the evidence given in the cause at unusual length. The plaintiff gave evidence of the possession of the property by P. Nolen, and sale by him to his brother, the plaintiff. P. Nolen, having been released from any warranty of title, stated under objection, that he had been a partner with Ralston in making lumber out of timber belonging to Ralston, and in 1844 informed him that a writ, at the suit of Irvine, was issued, and then proposed that one should buy out the other. The next day he bought out Ralston's interest, received possession, and ran the rafts down the river, where he bargained with Quigley to run them to market and sell them, but they were detained a year on account of the lowness of the water; he

then sold them to his brother, a few weeks before the levy, who paid $411, and gave his note for the balance of the price agreed upon, $760, which was yet unpaid. He admitted that, after this sale, he had made a written agreement to sell the same property in his own name, but stated he then acted as agent, and that his reason for purchasing from Ralston was to save himself, because his creditors were coming on him. The plaintiff, who thus purchased, was a sawyer who had been employed in getting out the timber.

The defendant then proved judgments confessed by Ralston, and executions immediately issued, under which he purchased, with notice of plaintiff's claim. He then gave evidence that plaintiff had said that P. Nolen was about taking some of his own lumber with this, which belonged to Ralston, to market, and selling it; that the sale to P. Nolen was nothing but a sham to prevent Ralston's creditors from seizing and sacrificing it, and when sold in Nolen's name the money would go to pay Ralston's debts. Ralston (called as a witness) stated the timber was his, and that Irvine had agreed to wait a year for his money; but on finding an execution had been issued, he (Ralston) was about delivering up his property to another when he met P. Nolen, who, being informed of the circumstances, advised a sale to himself, and said the timber might be run down and sold in his name, and the proceeds divided among his creditors. Ralston agreed, and sold all his property to him for several notes, amounting to $800. These were delivered in a private room, where he also handed Nolen $20 or $30 in relief notes, of one and two dollars each. When they left the room, a witness was procured, and the bank notes paid back, as if on the contract, counting the ones as tens and the twos as twenties. The plaintiff was then present. The notes were to be returned when the lumber was sold, and expenses paid. He denied that a partnership ever existed. Nolen had promised to give his receipt, but finding he had gone without doing so, Ralston pursued him, and meeting plaintiff, inquired about it; he stated that his brother had sold to him, and the design was to keep it from the creditors. When P. Nolen came up he confirmed the fact of the sale, but directed Ralston to go on and use the same authority as before. The notes of P. Nolen had been assigned to the present defendant two days before confession of the judgment, but Ralston said he did not expect he would issue execution.

The agent of the plaintiff confirmed this statement of the intention of the sale to P. Nolen, by his own statements, and proved that plaintiff was a day labourer, and reputed to be worth nothing. There was some other evidence of Ralston's admissions of having

made a sale of the lumber to P. Nolen, and a good deal attacking the characters of both Nolen, Ralston, and some of the other witnesses. There was also evidence that P. Nolen had paid the expenses of carrying the lumber to Quigley's, and furnished provisions for the hands.

Besides the admission of Nolen as a witness, there were two other questions of evidence raised. The first was, that the names of the witnesses were not contained in the notice of taking depositions. What the rule of court was on this subject is not stated on the record. The second is immaterial, as the facts on which it was based were not in the record.

The court, (WOODWARD, P. J.,) in charging the jury, said, in substance,—the question was one of ownership of the property, which clearly was originally Ralston's; that there was also clearly an apparent transfer of that property to P. Nolen, whether fair, as he testified, or fraudulent or otherwise, as Ralston proved. That there were notorious acts of ownership and possession accompanying this transfer, and one question was, whether the plaintiff was a purchaser *bona fide*, and without notice of the fraud between P. Nolen and Ralston, in which case he would not be affected by it. That Ralston's testimony was relied on to prove the fraud, that was to be taken with the facts of the confession of judgment and assignment of the notes of P. Nolen *to the present plaintiff.* Supposing he was believed, was there any thing more than a fair transfer for value by one indebted? As to the property, other than the lumber, it appeared conceded to be fraudulent; but the lumber was sold for a real and apparently adequate consideration; it might be that there was a mistake as to P. Nolen's capacity to pay; but nevertheless Ralston did sell and receive the securities, and permit the purchaser to expend his money, and contract for the transportation; and all would probably have gone on well if a rise in the river had permitted the lumber to get to market. But being detained there a year until a sale to plaintiff, then Ralston confesses judgment, and causes this property to be seized by the creditor, who still holds the notes given for the purchase. If there had been a mere colourable delivery of possession, and not a transfer of title, accompanied with possession and expenditure, then defendant might have seized, "but the difficulty is to find such was the transaction from the testimony of Ralston." The jury were to find the facts, but they could scarcely, from his testimony, find any other reason for his receipt of the paper and its transfer, than that it was the agreed price, and Ralston's security that Nolen would apply the proceeds

to his creditors. If so, how could defendant upset it a year afterwards? If he was a creditor, he was provided for; and as he held the notes, he seemed to have no right to complain of this mode of getting the timber to market. If he thought it fraudulent, why did he not act on his old judgment in another county, a year sooner. If the sale to P. Nolen was fair, his transfer to his brother, though injudicious, would not vitiate the former transaction. On Ralston's testimony was there any evidence of fraud? P. Nolen showed a fraud much greater on his part; but if there was a transfer and exclusive possession, defendant had no right to seize. If Ralston be believed, it was for the jury to say whether the transfer was merely colourable. Under this view they were to determine whether plaintiff was a purchaser without notice, as to which the court recapitulated the evidence.

The rejection and admission of the evidence, and various portions of the charge, as being on an incorrect assumption of the facts, and misleading the jury in the statement of the effect of Ralston's testimony, were the errors assigned.

*J. T. Hale,* (with whom was *Mackey,*) for plaintiff in error, contended that under their rules of court, when cross-interrogatories are to be filed, the names of the witnesses are to be stated in the notice of the party entering the rule, which was omitted to be done in this case. The creditors of Ralston alleged that the sale of the timber by him to Patrick Nolen was fraudulent, that the transaction was fraudulent throughout. The timber, when sold by Patrick Nolen to his brother James, was not moved. Where one called to testify believes himself to be interested, he is not competent. Patrick Nolen believed himself to be interested, and was therefore incompetent to testify. He considered himself the owner of the timber in dispute; Long *v.* Baielie, 4 Serg. & Rawle, 226. The court should have instructed the jury that the sale from Ralston to Patrick Nolen was fraudulent and void as to creditors. He cited Story's Eq. § 369; Streeper *v.* Eckart, 2 Whart. 308, to show what constituted a sale of chattels fraudulent.

*Beardsley* and *Armstrong,* contrà.—Patrick Nolen, when called to testify, had not expressed any opinion as to his being interested. It is not the law in Pennsylvania that one who believes himself interested is incompetent to testify. If it were, collusion, perjury and gross frauds would be the consequence. The judge, in his charge, does nothing more than state the testimony, and repeat to the jury what the witnesses said. He left the cause with the jury

upon all the facts in the case, and gave no direct instruction to the jury that certain facts were proved, and that they must so consider them. James Nolen an innocent purchaser. If there were fraud between Patrick Nolen and Ralston, he knew nothing of it. He cited Thompson *v.* Lee, 3 Watts & Serg. 479. Cadbury, the defendant, knew of the sale from Ralston to Patrick Nolen, and from Patrick to his brother James, the plaintiff below, and stands in the shoes of Ralston.

*June* 7.  COULTER, J.—The first exception is without any merit. The names of witnesses, so far as I know, are not inserted in the notice anywhere, and the rule of the court in the district does not require it to be done.

The second exception, which relates to the admission of Patrick Nolen as a witness, was properly considered as a matter affecting his credibility more than his competency. There was evidence that he had sold the rafts to James, and however strong the evidence was, even at that preliminary examination, that the affair was a fraud, yet the witness had no direct interest in the event of the suit, because the alleged sale was good as between Patrick and James, and as against Patrick himself divested his interest, so that *he* never could lawfully claim any thing produced by the suit, founded on the alleged invalidity of that sale. This is the true legal reason why he was not an incompetent witness.

The third error assigned is in admitting the deposition of William Mathews. But as that deposition is not on the paper-book, I decline to notice the exception under the rule of this court on the subject.

There are five other errors assigned, which all relate to the manner in which the court instructed the jury upon the subject of the alleged fraud, and which impugn the mode and manner in which the court commented on the facts. The counsel below submitted no points to the court by which they would have been drawn precisely to the legal position maintained by counsel here, as the true aspect of the case. The court wander over the whole facts, and view them with a strong bias, and intimate that they involve no *actual* fraud, but give no instruction as to what constitutes legal fraud; and the cause has been argued pretty much in the same way here. The apprehension, or perhaps more properly the comprehension, of actual fraud, depends much upon the moral sensibilities of the individual who contemplates the facts out of which it is supposed to arise. It is not, therefore, giving all the light and aid to

a jury which they ought to receive from the court, to tell them "the jury will decide whether there was a *bonâ fide* sale of the timber by Ralston to Patrick, accompanied with clear and exclusive possession, or only a colourable delivery of possession to cloak it from the creditors without a *bonâ fide* sale of the title," because, under such circumstances, it is often a matter of total indifference whether the alleged sale was *bonâ fide* or not. As against creditors it may not have the *taint* of actual fraud, and yet have the invalidity of *legal fraud*, although perfectly *bonâ fide*. Besides, the learned judge ought to have told the jury what constituted " clear and exclusive possession," as the greatest amount of difficulty in many cases of this class arises from the description or kind of possession accompanying and following the alleged transfer. The court made a strong argument to the jury to evince that no actual fraud existed, and they said emphatically, " taking Ralston's testimony to be the true view of the case, are any grounds disclosed for treating his sale to Patrick as fraudulent ?" This is a pregnant inquiry, and, taken in connection with all the court said before, could only be understood by the jury to mean that from all the testimony of Ralston, (whom the court, near the close of the charge, call the " champion of the defence,") there was no fraud, even according to the strongest evidence in favour of the defendant. And so instructing, I think the jury were misled, and that it was error in the court.

It appears to me to be a very gross case, with fraud sticking out at its elbows and knees, and especially and strongly so by the testimony of the said Ralston.

He says " that I met Pat Nolen, and told him that the sheriff was coming on me, and that I would give up to McCord my property. Patrick told me I had better not do it, for McCord would serve me as Irvin did. But he advised me to sell it to him, and the timber could be run down, and I could get the proceeds and divide it among my creditors. I thought the plan good ; he had been a friend. I said it was his timber after this. He took every thing I had that the sheriff could seize, timber, grain and all. He gave me notes for the timber to the amount of about $800. These are the six notes. They were given in a private room. I had got $70 from Joel Cadbury, to enable me to take down the lumber. I gave Patrick $25 or $30 of these notes—relief notes—in the private room. We had Mathews outside to witness. We were locked up. We came out in an entry. James was there. Patrick counted and gave me the money I had given him in the room, calling the ones tens, and the twos twenties: The money in that way came to about

2 E

$200. After that, I always said the lumber was Patrick's. The notes for $800 were to be returned when the lumber was sold and money paid. I had got the hands to run the raft down, but told them it was Patrick's. I stuck to the raft. Was along when it was left at Quigley's, the water being low." This is the outline of Ralston's testimony; the filling up only gives blotches of deeper hue. As a finale, however, he says that Patrick sold to his brother James, who was not worth a groat, with a view, as James told him, to keep it from creditors, with much more still darkening the aspect of the case. Now it appears to me that this disclosed a case of actual fraud, with a deep moral taint. There was secrecy, concealment, falsehood, duplicity—all with a view of defeating, or at least delaying and hindering the creditors of Ralston. There is mingled up with the case acts which the law abhors, and which are resorted to for the purpose of overcoming the law and the rights of others. This appears to me to be actual fraud. But can there be a doubt of its being a case of legal fraud? There was no delivering of possession, at least no evidence of it. It is true that a raft is not the subject of manual delivery, but every thing in the power of the parties ought to have been done. Hence as to a ship at sea, a symbolical delivery is sufficient. But here nothing whatever was done. There was neither symbolical delivery nor any declaration or manifestation of delivery, except what might be implied from Ralston's telling the hands and others that the lumber was Nolen's. But Ralston could have left the raft, after making a public declaration in the presence of witnesses, that he delivered it up and over to Nolen. This would have been some manifestation to the public of the delivery of possession and change of property. But instead of that, Ralston continues on the raft just as he had done before, and remains with it till the water fails, and it is stowed away at Quigley's. He furnishes considerable part of the money that was to pay expenses, &c. There was not that visible, open change of possession which the law requires, and it was the duty of the court so to instruct the jury, because in such cases the court must judge as to those acts which are sufficient evidence of delivery; Clow v. Woods, 5 Serg. & Rawle, 275; Streeper v. Eckart, 2 Whart. 308; Carpenter v. Mayer, 5 Watts, 483; Young v. McClure, 2 Watts & Serg. 147; Avery v. Street, 6 Watts, 247, cum multis aliis.

One thing more ought, perhaps, to be noticed. The court submitted to the jury the point of notice to James Nolen, as if it was unproved. That is a matter of which the jury are the rightful judges. That James knew the fraud, it was necessary to establish.

But Ralston swears he did; McClintock swears he did know it; and both of them say that his purchase from Patrick was only ancillary to the agreement between Ralston and Patrick, as James told them both, and that accords with the fact that Patrick afterwards contracted, in his own name, for the sale of the raft, with Brady and Foreman, and received part of the money.

Judgment reversed, and a *venire de novo* awarded.

Mr. Justice Burnside did not sit on this case, a near relation of his being interested.